**MILLER LAW FIRM**
Matthew R. Miller (SBN 194647)
6790 Embarcadero Lane, No. 100
Carlsbad CA., 92011
Telephone: (619) 261-1150
Email: matt@mrmlawfirm.com

Attorneys for Plaintiffs
THERAPEUTIC SOLUTIONS INTERNATIONAL, INC.,

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERAPEUTIC SOLUTIONS INTERNATIONAL, INC.; a Nevada Corporation;<br><br>   Plaintiffs,<br><br>v.<br><br>UNIVERSITY OF MIAMI, a Florida not for profit Corporation; CAMILLO RICORDI, M.D., an individual, and DOES 1-50, inclusive,<br><br>   Defendants. | Case No.: **'24 CV 2197 BEN JLB**<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF:**<br><br>**1. FRAUD;**<br>**2. FRAUD IN THE INDUCEMENT OF CONTRACT;**<br>**3. VIOLATION OF BUSINESS & PROFESSIONS CODE SECTION 17200;**<br>**4. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**<br>**5. NEGLIGENT MISREPRESENTATION; and**<br>**6. BREACH OF CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.**<br><br>**JURY DEMAND**<br>**(Unlimited Jurisdiction)** |

## INTRODUCTION

1. This action is brought by Therapeutic Solutions International, Inc. ("TSOI")

against the University of Miami (referred to as "Defendant," "Defendants," or "UM"), Camillo

Ricordi, MD (referred to as "Ricordi," "Defendant," and/or "Defendants"), and additional

defendants. TSOI, a pioneering biotechnology company, holds exclusive, worldwide patent

rights to the use and commercialization of the JadiCell Adult Donor Multi-Potent Mesenchymal Stem Cells, as outlined in Drug Master File (DMF) #18138 and described in U.S. Patent No.: 9,803,176 B2 ("JadiCells"). JadiCells are a unique and patented population of stem cells, known as mesenchymal, that are derived from umbilical cord tissue through a process of harvesting and culturing. These unique cells have the ability to differentiate into all cells of the human body. This makes JadiCells a promising option for treating a wide array of diseases, particularly in areas like neurology and lung diseases where other stem cell populations may be less effective or carry higher risks. TSOI acquired these rights to advance life-saving regenerative therapies aimed at treating severe brain and lung diseases.

2.     In 2018, TSOI initially secured a license from JadiCell, LLC, to use JadiCells for neurological conditions, including traumatic brain injury (TBI) and chronic traumatic encephalopathy (CTE). Then, in February 2021, TSOI expanded its license to include all lung diseases. Before this lung-related license was obtained, UM, on behalf of JadiCell, LLC, had completed a Phase 1/2a clinical trial purportedly using JadiCells to treat COVID-19 patients with severe lung failure. The results from the testing were promising, based on peer review studies, but the FDA, at the time the 2021 License was executed, had not made a decision whether to clear the JadiCells for Phase 3 testing. In August 2021, TSOI received clearance to initiate a Phase 3 trial for registration of the JadiCell as treatment for COVID-19 associated lung failure. If the FDA approved and cleared the Phase 3 testing and trials, JadiCell would be able to be commercially sold by TSOI throughout the United States first which would open up international opportunities later. The FDA's decision was monumental for TSOI and its stock, which increased in value. As a result of the FDA's decision to allow for Phase 3 testing, TSOI requested the material that UM used for the

testing, the Phase 3 IND, and a proposal for conducting the Phase 3 testing and clinical trials.  TSOI rejected UM's proposal and decided to engage a company specializing in Phase 3 testing for commercial purposes. UM then refused to provide the relevant material and documents to move forward.

3.   In March 2022, UM and TSOI entered into an Asset Transfer and License Agreement.  UM agreed to provide TSOI with the Phase 1/2a clinical data, transfer the Phase 3 IND, which is the application document to seek permission from the FDA to conduct human clinical trials and contains all the vital specifications on how the trial is to be conducted,  supply trial doses (including the investigational product and placebo), and furnish the necessary manufacturing documentation.   By March 2023, TSOI received manufacturing records from UM for the JadiCells produced for both the Phase 1/2a and the future Phase 3 trial.

4.   However, upon receiving these records, TSOI found them to be incomplete and lacking the necessary documentation to proceed with FDA Phase 3 testing.  The cells previously used, and those intended for TSOI to use, were not consistent with the product described in the DMF, or the JadiCell patent - - 75% of the documented and patented components of the product were absent.  TSOI contends that UM fraudulently induced them into signing the March 2022 Asset Transfer and License Agreement.  UM knew or should have known that it did not possess adequate documentation for the JadiCells as per the DMF requirements and '176 patent.  TSOI seeks damages, declaratory, and injunctive relief for Defendants' breaches of contract and fraud.

**THE PARTIES**

5.   Plaintiff THERAPEUTIC SOLUTIONS INTERNATIONAL, INC. (TSOI) is a Nevada Corporation authorized to do, and doing, business in San Diego County, California

at its satellite office.  TSOI is a publicly traded clinical stage biotechnology company that focuses on immune modulation and regenerative medicine for the treatment of various specific diseases.  The company develops a range of immune-modulatory agents to treat cancers, mental illness, suicidal ideation, brain diseases, and lung pathologies, with a drug pipeline consisting of 34 biological/cellular products and a patent portfolio containing 79 patents and patents pending developed in-house and one in-licensing for a current total of 80.  TSOI has incurred actual damages as a result of Defendants' fraud, deception, theft, and patent infringement.

6.     Defendant UNIVERSITY OF MIAMI (UM) is a private, not-for-profit, nonsectarian institution of higher learning with its principal place of business in Miami, Florida.  University of Miami, Office of Technology Transfer is located at 1951 NW 7th Avenue, Suite 30 Miami, Florida 33136.  Defendant CAMILLO RICORDI, M.D., is an individual residing in the state of Florida and is an employee of UM working at the Miller School of Medicine in the DeWitt Daughtry Family Department of Surgery.  Ricordi, along with his colleagues, conducted the Phase 1/2a clinical trial at UM as Principal Investigator and co-authored the scientific report following the conclusion of Phase 1/2a.

7.   The true names and capacities, whether individual, corporate, associate, or otherwise of Defendants sued herein as DOES 1-50, inclusive, are currently unknown to Plaintiff, who therefore sues Defendants by fictitious names.  Plaintiff is informed and believes, and based thereon allege, that each of the Defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein.  Plaintiff will seek leave of court to amend this Complaint to reflect the true names and capacities of Defendants designated hereinafter as DOES when such identities become known.

8.    Plaintiff is informed and believes and based thereon alleges that at all times material hereto, each of the Defendants named herein was the joint employer, agent, employer, alter ego and/or joint venture of, or working in concert with each of the other co-Defendants and was acting within the course and scope of such agency, employment, joint venture, partnership, common enterprise or concerted activity.  Each Defendant was the agent of each of the other Defendants, and in doing the things herein alleged, each defendant was acting within the scope of the agency and with the permission and consent of its co-defendants.

### JURISDICTION & VENUE

9.    This Court has jurisdiction over these claims for relief pursuant to 28 U.S.C. section 1332 as it involves citizens of different states and the amount in controversy is over $75,000.00.  Venue is proper in this judicial district, as the damages were incurred in this district, as TSOI operates its business, in part, in this district.

### GENERAL ALLEGATIONS

**A.    BACKGROUND, PRODUCTS, AND TECHNOLOGY CONTROLED BY TSOI.**

10.    TSOI has been a publicly traded company since 2007.  Initially, TSOI concentrated its business in developing, manufacturing, and commercializing products and therapies to assist patients with migraine and tension headache pain, bruxism, clenching, grinding, and TMJ disorders.  Its main product, Migran-X, was distributed and sold throughout the world. In approximately 2014, TSOI, transitioned to developing biologics.

11.    In 2018, TSOI acquired the worldwide exclusive rights to the JadiCell Adult Donor Multi-Potent Mesenchymal Stem Cell for neurological diseases like CTE ("Chronic Traumatic Encephalopathy") and TBI ("Traumatic Brain Injury") indications for the brain from

U.S. Patent No.: 9,803,176 B2 ('176).  In 2021, TSOI obtained the exclusive worldwide license using the '176 patent for all lung indications.

12.    Additionally, from February 2021 to the date of this filing, TSOI has continued to research and develop its biologic drug pipeline and intellectual properties.  During this time, TSOI has filed 37 new biological and nutraceutical patents with the United States Patent and Trademark Office (USPTO) bringing TSOI's portfolio to 79 letters patent and patent applications.  In addition, TSOI has filed four new Investigational Drug Applications with US FDA for Chronic Traumatic Encephalopathy , Metastatic Breast Cancer, COPD, and ARDS (acute respiratory distress syndrome.)  TSOI's biologic drug pipeline currently holds 34 biological drugs, all based on their own intellectual properties.  Five of those biologics are in human testing with the remainder having completed preclinical (animal testing) and are being prepared for human clinical trials.  TSOI has also launched eight subsidiary companies licensing each with its own intellectual property.

13.    TSOI is a publicly traded company on the OTC Markets.  TSOI is fully reporting and compliant with the SEC and has 13 years of Public Company Accounting Oversight Board (PCAOB) audits behind it.

14.    TSOI has an outstanding scientific advisory board that includes physicians and researchers like Dr. Santosh Kesari, a board-certified neurologist and neuro-oncologist and is currently Chair, Department of Translational Neuro-Oncology and Neurotherapeutics, John Wayne Cancer Institute has been with TSOI since 2015.  Dr. Franco Marincola is the Chief Scientific Officer of Sonata Therapeutics.  Dr. Marincola has been with TSOI since 2015 and brings over 30-years of research and development experience in immunology, oncology and cell therapy and spent more than two decades at the National Institutes of Health (NIH) and National Cancer Institute (NCI), most recently as

a tenured senior investigator in cancer immunotherapy and biomarker research and as Chief Infectious Disease and Immunogenetics Investigator at the NIH Clinical Center. Dr. Donald Banerji is a Clinical development professional with 33 years of global clinical research and development experience (Phase I-IV) in the pharmaceutical industry, and recently retired from Novartis as Global Clinical Development Head of Respiratory and Allergy Medicine.

15.    The Company was founded by the CEO, Timothy G. Dixon, who is also Chairman and inventor and co-inventor of TSOI's portfolio with co-director Thomas E. Ichim, Ph.D. Dr. Ichim is a veteran of multiple startups, backed by a track record of taking technologies from concept to clinic, to exit, across a diverse set of biotechnology disciplines. Dr. Ichim is also a professional inventor with over 320 issued and published patents/patent applications and 124 peer reviewed papers. Mr. Dixon also has extensive experience in dealing with corporate compliance matters with the U.S. Food and Drug Administration (FDA), as well as many international regulatory bodies. Mr. Dixon currently serves as Chairman of Allogen Biologics, Inc., ALS Biologics, Inc., Epilepsy Bio, Inc., Res Nov Bio, Inc., VasoSome Vascular, Inc., CTE Biologics, Inc., and Breathe Biologics, Inc., all subsidiaries of Therapeutic Solutions International, Inc.

**B.    TSOI'S AQUISITION OF RIGHTS TO USE JADICELLS FOR BRAIN AND LUNG.**

16.    In November of 2018, TSOI licensed from JadiCell, LLC, the exclusive world-wide right to use the JadiCells of US Patent 9,803,176 B2 ('176 and/or '176 patent) for neurological conditions, including traumatic brain injury (TBI) and chronic traumatic encephalopathy (CTE) using the JadiCell Adult Donor Multi-Potent Mesenchymal Stem Cells. TSOI's purpose is to eventually seek full commercialization of the JadiCell - - for CTE

first and eventually diseases like epilepsy, ALS, and hundreds of other neurological diseases and disorders. The JadiCells, because of their unique and patented properties, and ability to differentiate into new human cells, reduce inflammation, regenerate tissues, make new blood vessels and cross the brain blood barrier, making them an exceptional candidate for use in most neurological diseases and TSOI seized the opportunity.

17.     In late 2020, Dr. Amit Patel ("Patel"), who is the sole member of JadiCell, LLC, approached TSOI through their director, Dr. Thomas Ichim ("Ichim"), about further licensing JADI's JadiCell mesenchymal stem cell ("JadiCell") from US Patent 9,803,176 B2 in the area of lung damage.   The United States Food and Drug Administration (FDA) is responsible for protecting the public health by ensuring the safety, efficacy, and security of human and veterinary drugs, biological products, and medical devices; and by ensuring the safety of our nation's food supply, cosmetics, and products that emit radiation. FDA regulated clinical trials are usually conducted in 3 Phases. Phase 1 is safety, Phase 2 is safety and efficacy combined, and Phase 3 is primarily efficacy. When a drug or biological has completed all three Phases the developer then seeks a license from FDA in this case called a Biological License Application or BLA which allows the approved product to be transported and sold in interstate commerce.  Patel made this offer following the completion of an FDA cleared Phase 1/2a clinical trial, where both the safety and efficacy trials have been combined into a single trial, that UM had just completed using the JadiCell in Covid-19 patients with lung failure. The actual condition is known medically as acute respiratory distress syndrome (ARDS).   As part of his sales presentation Patel shared the peer reviewed paper that was the result of UM actually conducting the clinical trial.

18.     At the conclusion of the Phase 1/2a, which is a combination of Phase 1 for safety and Phase 2 for efficacy merged into a single clinical trial testing both safety and

efficacy simultaneously, a scientific report was prepared by UM with Camillo Ricordi, MD, as one of the co-authors.  Thereafter, a peer reviewed paper was published from the report on October 23, 2020.

19.    That paper, written by UM employees, was titled: "Umbilical cord mesenchymal stem cells for COVID-19 acute respiratory distress syndrome: A double-blind, Phase 1/2a, randomized controlled trial".

20.    In regard to UM's Phase 1/2a testing, the authors stated:

The current report presents, for the first time, the results of a double-blind, Phase 1/2a RCT testing UC-MSCs in 24 subjects with COVID-19 and ARDS. There was overall balance in the distribution of baseline characteristics, comorbidities, or concomitant treatments between the groups. No serious adverse events related to UC-MSC infusion were observed. There was no observed difference in number of subjects experiencing infusion-associated adverse events. At 28 days after the last infusion, patient survival was 91% in the UCMSC group and 42% in the control group (P = .015). Two SAEs were reported in the UC-MSC group and 16 in the control group, affecting two and eight patients, respectively (P = .04). SAE-free survival (P = .008) and time to recovery (P = .03) were significantly improved in the UC-MSC treatment group.

21.    The results as claimed were very impressive with an overall survival rate of 91% in a disease that nationally has a 40% mortality rate on average with standard of care. In discussions regarding the technology, Patel told TSOI that if they licensed it from him TSOI would receive the trial data, the trial doses from Master Cell Bank One that UM had

manufactured, and UM's IND for Phase 3 testing, and all the documentation surrounding manufacturing.  TSOI believed the data from the scientific report was accurate as the clinical trial was conducted at UM's medical school with one of its professors, Camillo Ricordi MD, as the principal investigator and published in a peer-reviewed medical journal.

22.    On February 9, 2021, JadiCell, LLC, accepted a $15,000,000 convertible promissory note ("CPN") from TSOI for an exclusive world-wide license for use under the designated areas of lung diseases.  The license was subsequently further defined by the parties in a memorializing License Agreement fully executed in September 2021.  This gave TSOI exclusive world-wide patent rights to US Patent 9,803,176 B2 (the "Patent") which included the drug master file (the Drug Master File) identified as DMF #18138, and master cell bank one (the "Master Cell Bank One") for all lung indications.

23.    Following the patent licensing transaction, and after a press release issued by TSOI, TSOI's share price increased significantly from about a penny to over 17 cents with heavy buying pressure from the public who were obviously excited about the news.  TSOI reached a market value of about $400,000,000. Market value is based on the total number of shares issued and outstanding multiplied by the market price at any given time.  The increase in TSOI's share price and volume was based upon the public anticipation that the Phase 3 IND would pass FDA scrutiny and be approved for clinical trials.  If the clinical trial, passed FDA Phase 3 testing, then TSOI would be able to commercialize the JadiCell to treat lung failure and create substantial revenue for the company.

24.    On or about August 5, 2021, the US FDA approved the Investigational Drug Application (IND) for Phase 3 testing using the JadiCell for covid-19 related acute respiratory distress syndrome.  TSOI issued a press release regarding this news that created substantial public excitement again in volume and trading which led to an increase

in share price.  By mid-August 2021 the stock was approximately $0.135 giving TSOI a Market Cap of approximately $330,000,000.

**C.**    **FDA'S APPROVAL TO BEGIN PHASE 3 TESTING, UM'S BREACH OF CONTRACT, AND FAILURE TO USE JADICELLS IN ITS CLINICAL TESTING.**

25.    In August, after the positive news from the FDA on clearance of the IND, TSOI was prepared to proceed with Phase 3 testing pursuant to the IND provided by UM.  TSOI was informed that UM was interested in conducting the Phase 3 trials, but TSOI wanted to get an estimate as to the costs versus using a Contract Research Organization (CRO).  A CRO is a company that specialize in conducting clinical trials by contract with drug and biologic developers.  As part of the due diligence process, TSOI arranged for a Zoom conference involving Timothy Dixon, Hugh Kelso, Esq., counsel for TSOI, and Dr. Thomas E. Ichim, on behalf of TSOI, Dr. Camillo Ricordi, Dr. Norma Kenyon, and Javier Peral, Esq. for UM, and Dr. Amit Patel for JadiCell, LLC.  The Zoom meeting occurred on or about August 18, 2021.  During that zoom session TSOI discovered that, apparently, Dr. Ricordi was kept in the dark by Patel regarding the exclusive licensing agreement, complete rights to master cell bank one, and the transfer of the Phase 3 IND that, at the time, was the property of JADI with Dr. Ricordi being the listed investigator.  Dr. Ricordi asserted that UM had rights to JadiCell for lung based on a 2018 agreement between UM and Jadi Cell, LLC.

26.    Unsurprisingly, Dr. Ricordi's reactions to TSOI's involvement was unnerving for Mr. Dixon and Dr. Ichim.   Dr. Patel and TSOI explained to Dr. Ricordi about the 2021 Patent License Agreement reached between TSOI and JadiCell, LLC, and confirmed that TSOI owned the exclusive world-wide rights to all lung diseases using the '176 patented JadiCells.  At the conclusion of the zoom meeting, Mr. Dixon requested that UM provide documentation of the trial doses used in Phase 1/2a and the trial doses to be used in Phase

3 and requested a budget proposal from UM as to how much it would charge TSOI to conduct the FDA Phase 3 testing pursuant to the IND.   UM agreed they would get documents and a budget proposal to TSOI.

27.    Later in August 2021 after the zoom call, Dr. Ricordi sent TSOI a proposed budget to conduct the Phase 3 testing at UM and the total costs were approximately $13,000,000.   The budget was to include 128 patients in the Phase 3 testing to be conducted at UM.  A few days later the Technology Transfer Office at UM sent an updated Budget for $30,000,000.

28.    In October 2021 UM provided documents to TSOI claiming the manufacturing and cell characterization were contained in the production.  After reviewing the documents, it appeared that satisfactory manufacturing data - -  including temperature and chain of custody logs, and regulatory documents , and  corresponding certificates of analysis by UM - - was not included.  Additionally, TSOI didn't understand why UM's proposal increased by $17,000,000.00 over a few days and was prompted to seek a quote from CRO's.   In response to these developments, on November 6, 2021, Mr. Dixon sent an email to Dr. Ricordi, UM, and Patel advising them the new budget was unacceptable.

29.    In November of 2021, an Inter Partes Review ("IPR") was filed on September 29, 2021with the Patent Trial Appeals Board ("PTAB") of the US Patent and Trademark Office in <u>Restem LLC v. JadiCell, LLC</u> Case # IPR2021-01535 challenging the validity if the '176 patent. An Inter Partes Review (IPR) is a new trial proceeding conducted at the U.S. Patent Trial Appeals Board to review the patentability of one or more claims in a patent only on the grounds that could be raised on the basis of prior art consisting of patents or printed publications.

30.    TSOI became concerned about Ricordi's continued insistence that UM had rights that were superior to TSOI's and TSOI requested that JadiCell, LLC write a letter to UM confirming TSOI's ownership in US Patent 9,803,176 B2.  In December 2021, JadiCell, LLC's attorney sent a letter to UM and TSOI, documenting and confirming TSOI's rights.  In December 2021,  after JadiCell, LLC's, letter, UM administrators took charge of the IND transfer agreement negotiations with TSOI.  By this time, TSOI had decided not to use UM for Phase 3 testing and instead opted to contract with a CRO known as Biorasi LLC for approximately $6.5 million dollars to conduct the multi-site clinical trial and write the scientific report at the conclusion.  On February 4, 2022, UM and TSOI executed a Memorandum of Understanding (the "MOU") regarding the IND transfer and other terms and obligations that included the transfer of the Phase 1/2a clinical trial data, transfer of the Phase 3 IND, transfer of the trial doses for placebo and JadiCell, and all of the cell manufacturing documentation.

31.    On March 24, 2022, Office of Technology Transfer, University of Miami (UM), and Therapeutic Solutions International, Inc. entered into an Asset Transfer and License Agreement whereby TSOI would receive the Phase 3 IND, trial doses, and supporting documentation so Biorasi could immediately proceed to clinical trials. Without the JadiCell manufacturing records, Biorasi could not receive the trial doses and therefore could not proceed.

32.    The material information relevant to the terms of the contract was the following: within ten (10) days of the Effective Date, 1) TSOI shall make an initial payment of two hundred thousand dollars ($200,000) to UM who will provide the first 50 trial doses of placebo and investigational products, along with all the manufacturing records; 2) within six (6) months of the Effective Date, TSOI shall make a second payment of one million eight

hundred thousand dollars ($1,800,000) (at the completion of the primary endpoint of the Phase 2b/3 clinical trial specified in the IND or (ii) one (1) year from the Effective Date), and 3) TSOI shall make a final payment of two million dollars ($2,000,000).  In turn, upon FDA approval of TSOI as Sponsor, TSOI will replace UM as Sponsor, receive all trial doses and JadiCell documentation, and intends to appoint James Veltmeyer, MD, Chief Medical Officer of TSOI as Principal Investigator [Exhibit_1].  In practical terms UM was to prepare the trial doses and documentation for those doses within a week of TSOI's wire. This was to allow TSOI to start enrolling patients into the clinical trial as soon as possible.  Had TSOI received all the doses, as this was only the first 50 so TSOI could get started, and had been able to complete the clinical trial, then UM would have received the next 1.8 million.  TSOI never received any doses, and TSOI did not receive the documentation until March of 2023.

33.    TSOI entered into this Agreement because it believed that the representations made by UM and Dr. Ricordi - - in a peer reviewed publication, multiple emails, phone calls, and zoom meetings, and FDA communications, were accurate.  UM and Dr. Ricordi represented that UM conducted a Phase 1/2a using the claimed JadiCells of the '176 patent; and the cells approved by the FDA for Phase 3 testing were the claimed JadiCells which according to the '176 patent expresses at least three cell markers selected from CD29, CD73, CD90, CD166, SSEA4, CD9, CD44, CD146, or CD105, and does not express at least three cell markers selected from CD45, CD34, CD14, CD79, CD106, CD86, CD80, CD19, CD117, Stro-1, or HLA-DR and are negative for NANOG, and that UM possessed all of the required and necessary  documentation for TSOI to receive the trial doses of both placebo and investigational product, i.e., JadiCells. TSOI would not have entered into the Asset Transfer and License Agreement if it had seen the manufacturing records ahead of time.

34.    Pursuant to the March 2022 Asset Transfer and License Agreement, TSOI wired UM $200,000 and began preparing to receive the first 50 doses of placebo and JadiCell investigational product for the FDA cleared Phase 3 IND # 19757 pursuant to the IND Asset Transfer and License Agreement.  TSOI negotiated and entered into a contract with the Contract Research Organization (CRO), Biorasi LLC, to contract six clinical testing sites, with investigators at each site to conduct Phase 3 human testing of the JadiCell with Biorasi overseeing all aspects of the trial including writing the scientific report at the conclusion of the Phase 3 trial.  As part of that agreement, TSOI needed to plan for the safe storage and distribution of the trial biologics.  The distribution site requires the associated description of the cell numbers received and characterization documentation, along with temperature logs, chain of custody logs, and regulatory paperwork including the cGMP (Certified Good Manufacturing Practices) paperwork received from JadiCell, LLC, for the "free aliquots" that were originally delivered as well as corresponding certificates of analysis by UM.

35.    In late April 2022, UM provided several thousand pages of documents to TSOI purportedly pursuant to the Asset Transfer and License Agreement.  TSOI reviewed those documents, but there wasn't anything related to the manufacturing of the JadiCells.  Biorasi, the company hired by TSOI to conduct the Phase 3 testing, could not proceed without the proper manufacturing data purportedly in UM's possession.

36.    In or around December 2022, TSOI obtained transcripts of the depositions of Camillo Ricordi and Amit Patel in the IPR action initiated in 2021.  Their testimony about the cells appeared to have contradicted what UM and Jadi Cell, LLC, represented about the cells used in Phase 1/2a and cleared for Phase 3.

37.   On August 26, 2022: Camillo Ricordi was deposed and admitted he was not familiar with the '176 patent.

> Q. So are you familiar with the Patent No. 9,803,176?
>
> A. No, I'm not. I never read the patent. But I was just asked to acknowledge that -- the cells we received them from Jadi Cell, they're not covered from that patent. *Ricordi-Dep.18:11-21:5*
>
> Q. Okay. So, in your understanding of the, quote, unquote, "Claimed Cells" from Paragraph of your declaration, does that term encompass isolated umbilical cells as described in the '176 Patent?
>
> A. Yeah, I don't -- I don't know the patent. So I said the "Claimed Cells" refer to the cells that we received that I was told that are covered by the patent. But I don't know. *Ricordi-Dep. 22:10-25*

38.   Again Dr. Ricordi admitted he provided no evidence that the cells he used were the claimed cells *Ricordi-Dep. 38:19-41:5; 48:8-ricordi*:

> Q. Okay. And so it's correct to say that this ,exhibit -- your publication, this Exhibit 2004, that does not describe the presence or absence of any other cell surface markers other than those four, correct?
>
> A. Correct
>
> Q. Okay. And it's also correct to say that your declaration doesn't describe the presence or absence of any other cell markers other than those four?
>
> Yes. *Ricordi-Dep. 38:19-41:5 cited in Pet. Reply at 26.*

39.    On September 26, 2022: Amit Patel was deposed.  He admitted he provided no evidence that the cells he provided to Dr. Ricordi were the claimed cells.

Q. I see that. But what I'm saying is the data of those markers, that

was not attached to your declaration, correct?

A. No. *Patel-Dep. 70:17-21*

40.    At the time of reviewing the transcripts, TSOI was still waiting for the key documents that was part of the March 2022 Agreement between TSOI and UM.

41.    On January 11, 2023, TSOI and UM had a Zoom conference meeting.  The Zoom call was attended by Timothy Dixon, Hugh Kelso, Esq. counsel for TSOI, and Dr. Norma Kenyon and Javier Peral, Esq. counsel for UM.  During that call, Mr. Dixon read directly from Ricordi's transcript describing the procedures and cell characterization testified to by Ricordi and Patel.  At the conclusion, Dr. Kenyon called Mr. Dixon a liar saying, "you're a liar, I don't believe you, he (Ricordi) would never do that".  In March 2023, UM's attorneys sent a letter to TSOI threatening to sue TSOI.  Attached to the letter were approximately thirty-five pages of documents that were required to be produced back in March / April 2022 as part of the Asset Transfer and License Agreement.

42. In March 2023, UM produced five sets of documents containing 3 COAs from Jadi Cell, University of Utah, and UM, courier documents,  and an adventitious viral study performed by Charles River, a third party testing laboratory.  These COAs established that the cells used by UM in its testing were not JadiCells. JadiCells have 16 unique biomarkers. The COA from JadiCell showed only four biomarkers present. The COA from University of Utah showed only four biomarkers.  The courier documents were consistent with shipping biologics. The Charles River was a viral study of the cells and showed them as being negative for endotoxins.  And the COA from UM showed only four biomarkers. All three

COA's showed the same four biomarkers which are not JadiCells.  JadiCells express 16 unique biomarkers and therefore 75% of the composition was missing from all three lab analyses.  TSOI could not begin Phase 3 using the doses prepared by UM because they were not JadiCells.

**D.    UM KNEW OR SHOULD HAVE KNOWN ITS LAB TESTING WAS FLAWED.**

43.    In 2014, Patel created Master Cell Bank One (MCB1), conducted laboratory analysis on the cells' surface markers, and produced a Certificate of Analysis (COA).  However, this COA did not confirm that the cells in MCB1 were the JadiCells described in the '176 patent.

44.    A month later, the University of Utah, where Patel was a professor, produced an identical COA for unclear reasons.

45.    In 2018, 25 vials of cells (5 million cells per vial) were shipped to UM with the two COAs mentioned earlier.  These COAs claimed that the cells shipped originated from MCB1 but in fact showed these were not the JadiCells described in the '176 patent regardless of what cell bank they originated from.

46.    A year later, UM analyzed the cells from Patel and produced a COA matching the previous two, further proving that the cells received were not the JadiCells of the '176 patent.

47.    When UM entered into a Material Transfer Agreement (MTA) with JadiCell in 2018, it explicitly agreed to follow the teachings of the '176 patent, which was included as an exhibit.  TSOI has since discovered that the cells UM manufactured from the aliquots provided by JadiCell, LLC, did not comply with the '176 patent's description or claims, even at a basic level.

48.     When UM and Ricordi applied for the Phase 1/2a clinical trial, they informed the FDA that they were using the JadiCell biologic described in DMF #18138 and used a letter of authorization citing the DMF.  However, their documentation did not support this claim.  Despite this, the FDA approved the trial, and 24 participants were involved. 12 received what was claimed to be JadiCells, and 12 received a placebo.  The informed consent forms also stated that participants were receiving JadiCells from DMF #18138, but certificates of analysis from multiple parties confirmed this was not true.

49.     After Phase 1/2a concluded, UM and Ricordi applied for Phase 3, again claiming they would use the JadiCells described in DMF #18138.  In August 2021, the FDA cleared the IND for Phase 3 trials.  However, UM either knew or should have known it lacked the necessary documentation to prove they ever possessed or used the JadiCells described in the '176 patent and DMF.  When TSOI began requesting this documentation during an August 2021 meeting, UM avoided providing it, delaying for nearly two years.

**E.     TSOI HAS BEEN DAMAGED BY UM'S BREACH OF CONTRACT AND FRAUD.**

50.     Repeatedly, DMF #18138 has been used to secure FDA approval for investigational drug applications, misleading both the FDA and TSOI into believing the proper JadiCells were being used.  TSOI initially acquired the lung rights to the '176 patent for $15 million to develop a biologic for treating lung diseases such as ARDS.  With 15,000 Americans diagnosed with ARDS each month, TSOI estimated potential gross monthly revenues of $3 billion if all patients were treated with JadiCells.

51.   However, the Defendants' actions derailed this plan, forcing TSOI to start over. TSOI has now at considerable expense authored and filed its own IND using its own patent and Master Cell Bank, as Phase 3 trials should have been completed long ago. TSOI's goal remains to finish Phase 3 and submit a Biologics License Application (BLA) to the FDA, a

necessary step for introducing a biologic into interstate commerce that includes applicant information, product/manufacturing information, pre-clinical studies, clinical studies, and labeling.

52.    Based on the available documents from the Phase 1/2a trial and the subsequent Phase 3 clearance built on those documents, TSOI now realizes that a Biologics License Application (BLA) would have been a failure.

53.    Until February 2023, TSOI believed that UM had the proper documentation. TSOI has lost $15 million in rights acquisition, over $400 million in market valuation, and the opportunity to generate tens of billions in annual revenue.  This clinical trial should have been completed by now, with a BLA granted and lives being saved.

54.    From August 2021 to March 2023, TSOI believed UM had valid manufacturing records proving that the JadiCells documented in DMF #18138 were used in Phase 1/2a and approved for Phase 3 trials.  However, UM has no such documentation, which has caused severe financial harm to TSOI.  The data and trial doses UM sold to TSOI are essentially worthless.  As a result, TSOI has had to create its own Master Cell Bank and bear significant expenses to essentially re-do everything that UM did from the beginning - - but now using legitimate and documented JadiCells.  TSOI will need to refile a new IND as a Phase 1/2 and repeat that Phase of testing at a cost of approximately $10,000,000.  Then, assuming TSOI can clear Phase 1/2, TSOI will need to apply for Phase 3 at an approximate cost of $20,000,000. This will cost TSOI an additional two and a half to three years in time on top of the almost two years we have already lost since entering into the Asset Transfer and License Agreement with UM. This has also cost TSOI patent life.

**FIRST CAUSE OF ACTION**
**Fraud & Deceit**
**(Against All Defendants)**

55.    Plaintiff repeats and realleges the allegations contained in all prior paragraphs as if set forth fully herein.

56.    Defendants made fraudulent statements to TSOI <u>and</u> concealed from it, and omitted to state to it, material facts.

57.    The misrepresentations and failure to disclose information herein alleged was made with the intent to induce TSOI to act and/or refrain from taking action.  TSOI did not know about this concealed information nor could have known or discovered UM's intentions.  UM knew or reasonably should have known that its acts and omissions would be relied on by TSOI.  Had TSOI known the truth it would not have entered into a relationship with UM.  UM provided assurances about the documentation on the JadiCells that they later failed to meet. UM hid this truth for over 560 days.   UM claimed they used JadiCells, and the documents received show UM did not use JadiCells ever.

58.    UM knew or should have known that they had no proof of ever using JadiCells in Phase 1/2a as well as the clearance of the Phase 3 IND and the trial doses set aside for that trial.  UM lied to the FDA. UM lied to the patients in Phase 1/2a who signed informed consents and patients died.  UM lied to TSOI.  This has tainted the JadiCell and spoiled all the clinical data forcing TSOI to start all over again from Phase 1/2 costing them 10's of millions more.

59.    TSOI reasonably relied on UM's deception and was harmed as a result of the deception.  Further, UM's concealment was a substantial factor in causing TSOI's harm. TSOI entered into a contract with Biorasi, LLC, and because the trial could not be completed TSOI had to enter into a settlement agreement with Biorasi on the original contract of $6,578,552 for a settlement of $318,000 that TSOI has paid in full.

60.     As a proximate result of the fraudulent conduct, as herein alleged, TSOI was induced into foregoing its rights by which TSOI has been damaged in a sum to be determined at trial. This caused great uncertainty in the markets as delays turned into months of uncertainty and TSOI's market valuation continued to slide to losses in excess of $400,000,000.

61.     The aforementioned conduct was an intentional misrepresentation, deceit, or concealment of material fact or facts known to UM, with the intention on the part of UM  to thereby deprive TSOI of property or legal rights, or otherwise cause injury, and was despicable conduct which subjected TSOI to a cruel and unjust hardship and with conscious disregard to TSOI's rights, so as to justify an award of exemplary and punitive damages.

### SECOND CAUSE OF ACTION
**Fraud In the Inducement of Contract**
**(Against All Defendants)**

62.     Plaintiff repeats and realleges the allegations contained in all prior paragraphs as if set forth fully herein.

63.     As alleged hereinabove, to induce Plaintiff to enter into the Contract, UM lied and misrepresented to Plaintiff material facts.

64.     At the time it made these false representations to Plaintiff, UM knew them to be false.

65.     Plaintiff reasonably relied upon UM's knowing misrepresentations in agreeing to enter into the Contract.

66. Had Plaintiff known Defendants representations were false and fraudulent, Plaintiff never would have agreed to enter into the Contract.

67. As a result of UM's knowingly false and fraudulent misrepresentations and Plaintiff's reliance thereupon, Plaintiff has suffered damages.

68. By reason of the foregoing, Plaintiff has been injured in an amount to be determined at trial but not less than $75,000, plus interest, for which sum the UM is liable to Plaintiff.

## THIRD CAUSE OF ACTION
**Violation of Business and Professions Code section17200**
**(Against All Defendants)**

69.    Plaintiff repeats and realleges the allegations contained in all prior paragraphs as if set forth fully herein.

70.    This cause of action is brought pursuant to Unfair Business Practices at Business and Professions Code section 17200 et seq. The conduct of Defendants, and each of them, constitutes unfair, unlawful and/or fraudulent business practices within the meaning of Business and Professions Code section 17200 et seq.

71.    Plaintiff brings this cause of action on behalf of itself and on behalf of the public as private attorneys general pursuant to Business and Professions Code section 17200 et seq.

72.    Pursuant to Business and Professions Code section 17200 et seq., Plaintiff seeks from Defendants, and each of them, restitution and disgorgement of all earnings, profits, compensation, benefits and other ill-gotten gains obtained by Defendants as a result of their conduct in violation of Business and Professions Code section 17200 et seq

73.    Pursuant to Business and Professions Code section 17200 et seq., Plaintiff seeks from Defendants, and each of them, an injunction from continuing to engage in the acts as set forth in this Complaint. Pursuant to Business and Professions Code section 17200 et seq., Plaintiff and the public will be irreparably harmed if such an order is not granted.

74.    Pursuant to Business and Professions Code section 17200 et seq., Plaintiff seeks that all Defendants, their officers, directors, principals, assignees, successors, agents, representatives, employees, subsidiaries, affiliates, and all persons, corporations and other entities acting by, through, under, or on behalf, of said Defendants, or acting in concert or participation with them, be permanently enjoined from directly or indirectly committing any violations of Business and Professions Code section 17200 et seq., including, but not limited to, the violations alleged in this Complaint.

**FOURTH CAUSE OF ACTION**
**(Intentional Interference with Prospective Economic Advantage**
**(Against All Defendants)**

75.    Plaintiff incorporates by reference each and every allegation as set forth above as if fully set forth herein.

76.    Plaintiff had existing economic relationships with third parties that contained reasonably probable future economic benefit to Plaintiffs.

77.    Defendants knew or should have known of these relationships.  And Defendants intentionally and wrongfully interfered with these prospective, beneficial economic relationships.  TSOI had a large net wealth investor committed to funding the trial who backed out at the last minute due to the ongoing delays.  TSOI found another funding source with GHS Capital, LLC and filed a Form S-1 with the SEC in late October 2022, which is a registration of new securities entering the market,  for an additional $10,000,000 in funding but TSOI was unable to access the funds due to the catastrophic downturn in market prices of TSOI's common stock.

78.    Plaintiff's economic relationships with third parties were in fact disrupted as a direct and proximate result of Defendants' actions and inactions.

79.    As a direct and proximate result of Defendants' actions and inactions, Plaintiff has suffered irreparable harm to its personal and professional reputations and goodwill.

80.    As a direct and proximate result of these false statements, Plaintiff has suffered and continues to suffer money damages, including lost revenue and increased costs, in an amount to be determined at trial.

81.    Defendants also acted with oppression, fraud, or malice as defined by California Civil Code section 3294 and engaged in highly reprehensible and despicable conduct warranting exemplary damages.

### FIFTH CAUSE OF ACTION
**Negligent Misrepresentation**
**(Against all Defendants)**

82.    Plaintiff repeats and realleges the allegations contained in all prior paragraphs as if set forth fully herein.

83.    The assertion, in a manner not warranted by the information of the person making it, of that which is not true, even if he believes it to be true, is actual fraud.

84.    Defendants intended that Plaintiff rely on their representations, and Plaintiff reasonably did so rely, to its detriment.

85.    Defendants' representations were a substantial factor in causing harm to Plaintiff, and Plaintiff has been harmed by its reliance on those representations.

### SIXTH CAUSE OF ACTION
**Breach of Contract / Rescission**
**(Against UM)**

86.    Plaintiff repeats and realleges the allegations contained in all prior paragraphs as if set forth fully herein.

87.    TSOI entered into a written agreement with UM.

88.     UM breached the agreement by claiming they had documented the use of JadiCells in Phase 1/2a and the trial doses of JadiCells manufactured and set aside for Phase 3.  TSOI had no reason to doubt UM when it entered into the Asset Transfer and License Agreement.  TSOI proceeded in good faith by obtaining proper financing, hiring the CRO Biorasi to physically conduct the Phase 3 trial, and patiently waiting on UM to provide manufacturing records.

89.     TSOI fulfilled its obligations and complied with any and all conditions and agreements to UM that it was required to perform, except such as have been excused by UM's actions or conduct.

90.     As a direct and legal result of UM's breaches of contract and breach of the covenant of good faith and fair dealing, TSI has been damaged in an amount to be proven at trial.  Alternatively, TSOI is entitled to rescission of the contract.  Plaintiff believes, and on such information and belief alleges, that there may be other factors constituting breach of the implied covenant of good faith and fair dealing which will be presented through discovery or at the time of trial.

91.     As a direct and proximate cause of the acts of UM, TSOI has suffered damages, including, but not limited to, loss of contract benefits, loss of interest, loss of time, loss of property, loss of business, all in sums to be proven at trial of this action, but well in excess of the jurisdictional minimum of this Court.

92.     UM acted despicably, willfully, wantonly, oppressively, fraudulently, or in conscious disregard of TSOI'S rights. TSOI seeks recovery of exemplary damages in an amount sufficient to punish UM.

### **PRAYER FOR RELIEF**

Wherefore, Plaintiff seeks judgment as follows:

1.  Compensatory damages;

2.  Equitable relief including but not limited to rescission, declaratory, and injunctive relief.

3.  Exemplary damages in an amount to be proven at trial in an amount sufficient to punish Defendants;

4.  Pre-judgment interest and post judgment interest at the maximum rate allowable by law;

5.  Attorneys' fees and costs if available under applicable law or contract; and

6.  Such other and further relief as the Court deems just and proper.

DATED:  November 22, 2024,                **MILLER LAW FIRM**

                                          By:   *Matthew R. Miller*

                                                Matthew R. Miller
                                                Attorneys for Plaintiff
                                                THERAPEUTIC SOLUTIONS
                                                INTERNATIONAL, INC.

# Exhibit 1

# Asset Transfer and License Agreement

DocuSign Envelope ID: 584B5676-3413-4286-94ED-67E5D0D258E1

## ASSET TRANSFER AND LICENSE AGREEMENT

This Asset Transfer and License Agreement (this "Agreement") is made effective as of last date of signature below ("Effective Date") by and between the University of Miami, with offices at 1951 NW 7th Avenue, Suite 300 Miami, Florida 33136 ("UNIVERSITY"), and Therapeutic Solutions International, Inc., with offices at 4093 Oceanside Blvd. Suite B, Oceanside California 92056 ("TSOI").   Each of UNIVERSITY and TSOI may be referred to individually as a "Party," or collectively as the "Parties."

## RECITALS

**WHEREAS,** UNIVERSITY is the sponsor and owner of the Regulatory Assets and Patent Rights (as defined below), respectively;

**WHEREAS,** UNIVERSITY and Jadi Cell, LLC entered into a material transfer agreement on May 4, 2018 ("MTA"), which allows UNIVERSITY to produce clinical-grade cellular product from the umbilical cord-derived mesenchymal stem cells provided by Jadi Cell ("Master Cell Bank One"), and UNIVERSITY is currently in possession of a certain amount of Master Cell Bank One;

**WHEREAS,** TSOI and Jadi Cell, LLC entered into a license agreement on February 9, 2021 (including rights to United States patent 9,803,176 ("Jadi Patent"), a drug master file with the United States Food and Drug Administration ("FDA") on the manufacturing of cells described under the aforementioned patent, and Master Cell Bank One), which, among other rights, allows TSOI the exclusive right to utilize the Jadi Patent to commercialize products and services in the treatment of lung disease and to conduct research relating thereto, including to commercialize the Cell Doses (as defined below) for certain medical indications, and provides rights to TSOI to access Master Cell Bank One and derivative cells, including the Cell Doses from UNIVERSITY;

**WHEREAS,** UNIVERSITY desires to assign, transfer, sell, or license to TSOI certain rights in and to the Regulatory Assets and Cell Doses in order to advance commercial development of the Cell Doses as part of the IND (as defined below);

**WHEREAS,** TSOI desires to purchase or acquire certain rights to the Regulatory Assets and Cell Doses in order to commercialize the Cell Doses;

**WHEREAS,** TSOI acknowledges UNIVERSITY's Patent Rights, and knowingly declines to obtain rights to practice such Patent Rights;

**WHEREAS,** the Parties have entered into a non-binding letter of intent on February 4, 2022, which outlines certain principal terms that are included in and made binding by this Agreement; and

**WHEREAS,** each Party is duly authorized and capable of entering into this Agreement.

**NOW, THEREFORE,** in consideration of the covenants and premises set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## AGREEMENT

### 1. DEFINITIONS

1.1   "Cell Dose" shall mean 100 million ± 20 million cryopreserved, clinical-grade, umbilical cord-derived mesenchymal stem cells final batch product derived from Master Cell Bank One.

1.2   "Excluded Entity" shall mean any corporation, business entity, or person (i) associated with the development or commercialization of alcohol, tobacco products, private prisons, military

DocuSign Envelope ID: 584B5676-3413-4286-94ED-67E5D0D258E1

armaments, and pornography; or (ii) on any list of prohibited individuals or entities enacted under United States economic sanctions and anti-boycott laws.

1.3   "Regulatory Assets" shall mean the FDA investigational new drug application #19757 ("IND"). Subject to Section 2.2, "Regulatory Assets" shall also include any data, documentation, protocols, and correspondence that are necessary or useful to obtain regulatory marketing approval of the drug product contemplated in the IND; provided that they:

(a)   exist as of the Effective Date;

(b)   were developed by Drs. Giacomo Lanzoni or Camillo Ricordi;

(c)   directly relate to the UNIVERSITY innovation disclosure reference UMIP-704, entitled "Umbilical cord-derived mesenchymal stem cells for treatment of COVID-19 patients"; and

(d)   are under UNIVERSITY's control.

1.4   "Patent Rights" shall mean United States provisional application #63/303,585, filed on January 27, 2022, and entitled "Methods of Analyzing Soluble Tumor Necrosis Factor Receptor 2 (sTNFR2) and Uses Thereof," and any patents that issue therefrom or on inventions originally disclosed therein (including any and all divisionals, continuations, and continuations-in-part solely to the extent that all of the claims of any such continuations-in-part are wholly supported by the patents or patent applications) together with re-examinations or reissue of such, and any extensions of or supplementary protection certificates referencing any of the foregoing.

## 2.  ASSET TRANSFER AND CONSIDERATION

2.1   SCHEDULE OF EVENTS.  As consideration for the assignment, transfer, sale, or license of the Regulatory Assets and Cell Doses as set forth below in this Section 2.1, TSOI agrees to pay UNIVERSITY the amounts set forth below in this Section 2.1.  The Parties shall complete their respective obligations within the specified times and in the order stated below:

(a)   Within ten (10) days of the Effective Date, TSOI shall make an initial payment of two hundred thousand dollars ($200,000) to UNIVERSITY;

(b)   Within five (5) days receipt of the payment specified in Section 2.1(a), UNIVERSITY shall take all reasonably necessary actions to effect the transfer, assignment, sale, or license of the Regulatory Assets to TSOI.  Immediately following such, TSOI shall take all reasonably necessary actions to accept the transfer, assignment, purchase, or license of the Regulatory Assets.  For the avoidance of doubt, the IND shall be assigned to TSOI;

(c)   TSOI shall make all the necessary arrangements, including payment of shipping and handling costs, for the transfer of the Cell Doses from UNIVERSITY to TSOI or TSOI's designee.  TSOI shall provide to UNIVERSITY the necessary information to ship the Cell Doses to TSOI or TSOI's Designee;

(d)   Within five (5) days of UNIVERSITY's receipt of the (i) payment specified in Section 2.1(a) or (ii) the shipping information specified in Section 2.1(c), whichever is later, UNIVERSITY shall ship fifty (50) Cell Doses to TSOI or TSOI's designee;

(e)   Within six (6) months of the Effective Date, TSOI shall make a second payment of one million eight hundred thousand dollars ($1,800,000) to UNIVERSITY;

(f)   Within five (5) days or as soon as practicable of UNIVERSITY's receipt of the (i) payment specified in Section 2.1(e) or (ii) the shipping information specified in Section 2.1(c), whichever is later, UNIVERSITY shall ship one hundred (100) Cell Doses to TSOI or TSOI's designee;

DocuSign Envelope ID: 584B5676-3413-4286-94ED-67E5D0D258E1

(g)   Within five (5) days of receipt of the Cell Doses specified in Section 2.1(f) by TSOI or TSOI's designee, TSOI shall make a third payment of one million dollars ($1,000,000) to UNIVERSITY; and

(h)   At the earlier of (i) successful completion of the primary endpoint of the phase 2b/3 clinical trial specified in the IND or (ii) one (1) year from the Effective Date, TSOI shall make a final payment of two million dollars ($2,000,000) to UNIVERSITY. Notwithstanding the foregoing, if, following TSOI or TSOI's designee's receipt of the Cell Doses specified in Section 2.1(f), TSOI terminates the clinical trial or UNIVERSITY terminates this Agreement pursuant to Section 3.2, TSOI shall make the final payment of two million dollars ($2,000,000) to UNIVERSITY immediately.

2.2   <u>DATA RIGHTS</u>.  Ownership of the data or results that are part of the Regulatory Assets shall remain with UNIVERSITY.  UNIVERSITY hereby grants to TSOI, and TSOI hereby accepts, a non-exclusive license to use such data or results to obtain regulatory marketing approval of the drug product contemplated in the IND.

2.3   <u>NO LICENSE TO PATENT RIGHTS</u>.  TSOI acknowledges that the Patent Rights may be necessary for the continued development or commercialization of the drug product contemplated in the IND, and TSOI knowingly declines a license to the Patent Rights.  UNIVERSITY does not grant any right, title, or interest to the Patent Rights to TSOI by way of this Agreement.  Nothing in this Agreement shall be construed in any way as UNIVERSITY granting, or being obligated to grant, to TSOI any right, title, or interest to the Patent Rights.

2.4   <u>ONGOING ASSISTANCE</u>.  The Parties shall cooperate in good faith to effect the provisions of Section 2.1. Furthermore, UNIVERSITY will use commercially reasonable efforts to provide TSOI with ongoing assistance related to the IND; however, such assistance shall be limited to one (1) hour per week during normal business hours.  The commitment for UNIVERSITY to provide such assistance shall terminate at the earlier of (i) successful completion of the primary endpoint of the phase 2b/3 clinical trial specified in the IND or (ii) one (1) year from the Effective Date.  Additional assistance shall be compensated at fair market value in a separate agreement with the necessary entities.

2.5   <u>PAYMENT TERMS</u>.  All payments specified in this Agreement are stated, and shall be made, in United States dollars.  All payments due are payable by check or wire transfer to the address listed in Section 8 (Notice) or using the wiring instructions provided by UNIVERSITY, and shall be deemed received when the complete payment is credited to UNIVERSITY's bank account.  Until all funds are received by UNIVERSITY, the payment by TSOI is not considered to be complete. No transfer, exchange, collection, or other charge, including any wire transfer fees, shall be deducted from such payments.

## 3. TERM AND TERMINATION

3.1   <u>TERM</u>. Unless this Agreement is terminated earlier in accordance with any of the other provisions of this Section 3, the term of this Agreement shall commence on the Effective Date and shall remain in effect until the later of (i) all of the obligations in Section 2.1 are completed or (ii) five (5) years.

3.2   <u>TERMINATION</u>.

(a)   Either Party shall have the right to terminate this Agreement if the other Party commits a material breach of an obligation under this Agreement and fails to cure such breach within thirty (30) days of receipt of written notice from the non-breaching Party.  A material breach shall include without limitation a failure to deliver to UNIVERSITY any payment at the time

DocuSign Envelope ID: 584B5676-3413-4286-94ED-67E5D0D258E1

such payment is due under this Agreement; conversely, any failure of UNIVERSITY to timely assign the IND or deliver Cell Doses when due shall constitute a material breach. Such termination shall be effective upon further written notice to the breaching Party after failure by the breaching Party to cure.

(b)    The rights granted and assets transferred by UNIVERSITY to TSOI in this Agreement have been done so on the basis of the special capability of TSOI to perform and development work leading to the manufacture and marketing of the Cell Doses. Accordingly, TSOI covenants and agrees that in the event any proceedings under Title 11, United States Code or any amendment thereto, be commenced by or against TSOI, and, if against TSOI, said proceedings shall not be dismissed with prejudice before either an adjudication in bankruptcy or the confirmation of a composition, arrangement, or plan of reorganization, or in the event TSOI shall be adjudged insolvent or make an assignment for the benefit of its creditors, or if a writ of attachment or execution be levied upon the asset transfer or license hereby created and not be released or satisfied within ten (10) days thereafter, or if a receiver be appointed in any proceeding or action to which TSOI is a party with authority to exercise any of the rights or privileges granted hereunder and such receiver be so discharged within a period of forty-five (45) days after his appointment, any such event shall be deemed to constitute a breach of this Agreement by TSOI and, UNIVERSITY, at the election of UNIVERSITY, but not otherwise, ipso facto, and without notice or other action by UNIVERSITY, shall terminate this Agreement and all rights of TSOI hereunder and all rights of any and all persons claiming under TSOI.

(c)    The Parties agree that breach of terms of this Agreement by either Party would immediately and irreparably damage the non-breaching Party in a way not capable of being fully compensated by monetary damages and accordingly, the non-breaching Party would be entitled to seek injunctive relief in addition to such other relief to which it may be entitled at law or in equity.

(d)    Upon termination of this Agreement for any reason, TSOI shall pay to UNIVERSITY within ten (10) business days any amounts accrued as of the effective date of such termination. Any termination of this Agreement shall be without prejudice to UNIVERSITY's right to recover all amounts accruing to UNIVERSITY prior to the effective date termination or cancellation. Except as otherwise provided herein, should this Agreement be terminated for any reason whatsoever, TSOI shall have no rights, express or implied, under any of UNIVERSITY's intellectual property rights that are the subject matter of this Agreement, nor have the right to recover any monies paid to UNIVERSITY hereunder. Failure to terminate on any basis shall not prejudice or impact the Parties' rights and ability to subsequently terminate for the same or related basis.

(e)    Additionally, upon termination of this Agreement, TSOI shall transfer to UNIVERSITY all Regulatory Assets, plus any additional data or documentation obtained subsequent to the Effective Date necessary to commercialize Cell Doses, including without limitation manufacturing data and protocols, raw clinical trial data, regulatory correspondence, regulatory applications, and clinical site contact information. Furthermore, at UNIVERSITY's request, TSOI shall provide the necessary assistance to transition the commercialization efforts of Cell Doses to a new entity of UNIVERSITY's choosing.

DocuSign Envelope ID: 584B5676-3413-4286-94ED-67E5D0D258E1

## 4. COMPLIANCE WITH LAWS

4.1  COMPLIANCE WITH APPLICABLE LAWS.  TSOI shall at all times during the term of this Agreement, and for so long as it shall use the Regulatory Assets or Cell Doses, comply with all laws that may control the import, export, manufacture, use, and other commercial exploitation of the Regulatory Assets or Cell Doses, or any other activity undertaken pursuant to this Agreement. The Parties further agree that each shall comply with all applicable federal and state laws, rules, and regulations in performing their respective obligations under this Agreement including, but not limited to, HIPAA and the federal Anti-Kickback Statute; 42 U.S.C. § 1320a-7b(b).

4.2  EXPORT CONTROL REGULATIONS.  It is understood that UNIVERSITY and TSOI are subject to United States laws and regulations controlling the export of technical data, computer software, laboratory prototypes, and other commodities (including the Arms Export Control Act, as amended and the Export Administration Act of 1979), and that its obligations hereunder are contingent on compliance with applicable United States export laws and regulations. The transfer of certain technical data and commodities may require a license from the cognizant agency of the United States government or written assurances by TSOI that TSOI shall not export data or commodities to certain foreign countries without prior approval of such agency.  UNIVERSITY neither represents that a license shall or shall not be required nor that, if required, it shall be issued. TSOI represents and warrants that it will comply with all United States export control laws, rules, and regulations.  TSOI is solely responsible for any violation of such laws and regulations by itself or its agents, and it will indemnify, defend, and hold UNIVERSITY harmless for the consequences of any such violation.

## 5. REPRESENTATIONS, INDEMNIFICATION, AND LIMITATION OF LIABILITY

5.1  UNIVERSITY REPRESENTATIONS.  UNIVERSITY hereby represents and warrants that it:

(a)  is the sole owner of all right, title, and interest in, and to, the Regulatory Assets;

(b)  has not assigned, transferred, exclusively licensed, pledged, or otherwise encumbered the Regulatory Assets;

(c)  subject to the MTA, has full power and authority to enter into this Agreement and to make the assignments and transfers as provided in Section 2; and,

(d)  was not acting within the scope of employment of any third party, other than rights and obligations of the MTA, when conceiving, creating, or otherwise performing any activity with respect to any item of the Regulatory Assets.

5.2  TSOI REPRESENTATIONS.  TSOI hereby represents and warrants that it:

(a)  has full power and authority to enter into this Agreement;

(b)  has sufficient resources and licenses to complete the transaction contemplated by this Agreement and the authority to commit such resources for the purposes of such transaction; and

(c)  is ultimately responsible for its submissions and filings with the FDA arising from the Regulatory Assets or Cell Doses, and holds UNIVERSITY harmless from any and all liability arising from such submissions and filings.

5.3  INDEMNIFICATION.  TSOI will defend, indemnify, and hold harmless UNIVERSITY, its trustees, officers, faculty, employees, and students ("UNIVERSITY Indemnitees") against any and all losses, expenses, claims, actions, lawsuits, and judgments thereon (including attorneys' fees through the appellate levels) (collectively "Liabilities") that may be brought against UNIVERSITY

DocuSign Envelope ID: 584B5676-3413-4286-94ED-67E5D0D258E1

Indemnitees by third parties as a result of or arising out of: (i) any negligent act or omission of TSOI or its agents or employees; (ii) any breach of this Agreement; (iii) any damage or injury (including death) to persons or property suffered, in whole or in part, or claimed to have been suffered through any act or omission of TSOI or its employees or agents in performing obligations under this Agreement; or (iv) the use, production, manufacture, sale, lease, consumption, or advertisement of any Regulatory Asset or Cell Dose by TSOI or its agents or employees; provided, however, TSOI shall not defend, indemnify, or hold harmless any UNIVERSITY Indemnitee from any Liabilities to the extent that such Liabilities are finally determined to have resulted from the willful negligent acts or omissions of such UNIVERSITY Indemnitee. For all covered Liabilities, TSOI will bear all costs and expenses incurred in connection with the defense of any such claims or as a result of any settlement made or judgment rendered on the basis of such claims. TSOI agrees to provide attorneys that shall be approved by UNIVERSITY Indemnitees at their sole and absolute discretion to defend against any actions brought or filed against any UNIVERSITY Indemnitee hereunder with respect to the subject of indemnity contained herein, whether or not such actions are rightfully brought; provided, however, that any UNIVERSITY Indemnitee shall have the right to retain its own counsel, at the reasonable expense of TSOI, if representation of such UNIVERSITY Indemnitee by counsel retained by TSOI would be inappropriate because of conflict of interests or otherwise. TSOI agrees to keep UNIVERSITY informed of the progress in the defense and disposition of such claim, and to consult with and obtain the approval of UNIVERSITY prior to any proposed settlement.

5.4    LIMITATION OF LIABILITY. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, UNIVERSITY SHALL NOT BE LIABLE FOR ANY SPECIAL, LOST PROFIT, EXPECTATION, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, EXEMPLARY, OR OTHER INDIRECT DAMAGES IN CONNECTION WITH ANY CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER GROUNDED IN TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, CONTRACT, OR OTHERWISE. UNIVERSITY'S TOTAL LIABILITY FOR ANY AND ALL CLAIMS OR ACTIONS ARISING FROM OR RELATED TO THIS AGREEMENT WILL IN NO EVENT EXCEED THE TOTAL AMOUNT PAID BY TSOI TO UNIVERSITY.

5.5    DISCLAIMER OF WARRANTIES. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT AND AS REQUIRED BY LAW, UNIVERSITY MAKES NO WARRANTIES, EXPRESS, OR IMPLIED, AND HEREBY DISCLAIMS ANY SUCH WARRANTIES, AS TO ANY MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, THE CONDITION OF ANY REGULATORY ASSET OR CELL DOSE, WHETHER TANGIBLE OR INTANGIBLE, ASSIGNED, TRANSFERRED, OR LICENSED UNDER THIS AGREEMENT; OR OF MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE, OF SUCH REGULATORY ASSET OR CELL DOSE. UNIVERSITY PROVIDES TSOI THE RIGHTS GRANTED UNDER THIS AGREEMENT AS IS, AND WITH ALL FAULTS, AND MAKES NO WARRANTY OR REPRESENTATION (i) REGARDING THE VALIDITY OR SCOPE OF THE REGULATORY ASSETS OR CELL DOSES; AND (ii) THAT EXPLOITATION OF THE REGULATORY ASSETS OR CELL DOSES WILL NOT INFRINGE ANY PATENTS OR OTHER INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY. UNIVERSITY DISCLAIMS ALL LIABILITY ARISING FROM MASTER CELL BANK ONE SUPPLIED.

# 6. ASSIGNMENT

6.1    PERMITTED ASSIGNMENT. TSOI may assign or delegate its rights or obligations under this Agreement only under the following circumstances:

(a) by providing UNIVERSITY with written notice of the proposed assignment, including the proposed assignee's contact information, at least thirty (30) days prior to the date of

DocuSign Envelope ID: 584B5676-3413-4286-94ED-67E5D0D258E1

assignment, and obtaining UNIVERSITY's express written consent to the proposed assignment; or

(b) as part of a sale or change of control, regardless of whether such a sale or change of control occurs by operation of law or through an asset sale, stock sale, merger or other combination, or any other transfer of: (i) TSOI's entire business or (ii) that part of TSOI's business that exercises all rights granted under this Agreement. Notwithstanding the foregoing, any assignment to an Excluded Entity is strictly prohibited.

6.2   CONDITIONS OF ASSIGNMENT.  Prior to any assignment (including an assignment by operation of law), (a) the proposed assignee must agree in writing to UNIVERSITY to be bound by this Agreement.

6.3   ANY OTHER ASSIGNMENT.  Any attempt by TSOI to assign this Agreement that fails to comply with this Section 6 will be null and void.

6.4   SUCCESSORS AND ASSIGNS.  This Agreement shall extend to and be binding upon the successors and legal representatives and permitted assigns of the Parties.


## 7.  CONFIDENTIALITY

7.1   CONFIDENTIAL INFORMATION.  From time-to-time during the term of this Agreement, a Party, the "Disclosing Party", may disclose or make available to the other Party, the "Receiving Party", information about its business affairs, confidential intellectual property, trade secrets, know-how, copyrights, trademarks, designs, data, algorithms, code, patent applications, and oral communications relating to the Regulatory Assets or Cell Doses, third-party confidential information and other sensitive or proprietary information (collectively, "Confidential Information"). Confidential Information shall not include information that, at the time of disclosure, and as established by documentary evidence:

(a) is or becomes generally available to and known by the public other than as a result of, directly or indirectly, any breach of this Section 7 by the Receiving Party or any of its employees, agents, or representatives;

(b) is or becomes available to the Receiving Party on a non-confidential basis from a third-party source, provided that such third party is not and was not prohibited from disclosing such Confidential Information;

(c) was known by or in the possession of the Receiving Party or its employees, agents, or representatives prior to being disclosed by or on behalf of the Disclosing Party; or

(d) was or is independently developed by the Receiving Party without reference to or use of, in whole or in part, any of the Disclosing Party's Confidential Information.

7.2   RECEIVING PARTY OBLIGATIONS. The Receiving Party shall:

(a) protect and safeguard the confidentiality of the Disclosing Party's Confidential Information with at least the same degree of care as the Receiving Party would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care;

(b) not use the Disclosing Party's Confidential Information, or permit it to be accessed or used, for any purpose other than to exercise its rights or perform its obligations under this Agreement; and

(c) not disclose any such Confidential Information to any person or entity, except to the Receiving Party's employees, agents, or representatives who need to know the Confidential

DocuSign Envelope ID: 584B5676-3413-4286-94ED-67E5D0D258E1

Information to assist the Receiving Party, or act on its behalf, to exercise its rights or perform its obligations under this Agreement and who are bound by written obligations of confidentiality and restrictions on use that cover such Confidential Information and are at least as stringent as those set forth in this Agreement.

7.3 <u>COURT OR GOVERNMENT ORDER</u>. Notwithstanding anything in this Agreement to the contrary, Receiving Party and representatives shall promptly return to the Disclosing Party all copies, whether in written, electronic, or other form or media, of the Disclosing Party's Confidential Information. Receiving Party may make disclosures of Confidential Information of the Disclosing Party to the extent required to be disclosed pursuant to applicable federal, state, or local law or a valid order issued by a court or governmental agency of competent jurisdiction; provided that (i) the Receiving Party gives the Disclosing Party prompt written notice of such requirement prior to disclosure, (ii) the Receiving Party reasonably cooperates with the Disclosing Party's efforts to limit the scope of the information to be provided or to obtain an order protecting the information from public disclosure, and (iii) the Receiving Party discloses only that portion of the Confidential Information that is legally required to be disclosed.

7.4 <u>RETURN OF CONFIDENTIAL INFORMATION</u>. Upon expiration or termination of the Agreement, at the Disclosing Party's written request, the Receiving Party and its employees, agents, or representatives shall return Confidential Information, or destroy all such copies and certify in writing to the Disclosing Party that such Confidential Information has been destroyed.

7.5 <u>REMEDIES</u>. The Receiving Party shall be responsible for any breach of this Section 7 caused by any of its employees, agents, or representatives. The Disclosing Party may seek equitable relief (including injunctive relief) against the Receiving Party to prevent the breach or threatened breach of this Section 7 and to secure its enforcement, in addition to all other remedies available at law.

## 8. NOTICE

Any notice, payment, report, or other correspondence (hereinafter collectively referred to as "Correspondence") required or permitted to be given hereunder shall be mailed by certified mail or delivered by hand or via email to the Party to whom such Correspondence is required or permitted to be given hereunder. If mailed, any such notice shall be deemed to have been given when mailed as evidenced by the postmark at point of mailing. If delivered by hand, any such Correspondence shall be deemed to have been given when received by the Party to whom such Correspondence is given, as evidenced by written and dated receipt of the receiving Party.

All Correspondence to TSOI shall be addressed as follows:

Therapeutic Solutions International, Inc.
4093 Oceanside Blvd. Suite B
Oceanside, California 92056
Attn: Timothy G. Dixon, CEO

All Correspondence to UNIVERSITY shall be addressed, in duplicate, as follows:

FOR NOTICE AND PAYMENT:
Office of Technology Transfer
University of Miami
1951 NW 7th Avenue, Suite 300
Miami, Florida 33136
Attn: Director
Email: techtransfer@med.miami.edu

DocuSign Envelope ID: 584B5676-3413-4286-94ED-67E5D0D258E1

WITH A COPY FOR NOTICE TO:

Office of the General Counsel
University of Miami
1320 South Dixie Highway, Suite 1250
Gables One Tower
Coral Gables, FL 33146

Either Party may change the address to which Correspondence to it is to be addressed by notification as provided herein.

## 9. MISCELLANEOUS PROVISIONS

9.1. <u>INSURANCE</u>.

    (a)  Prior to the commencement of clinical trials for the first Cell Dose, TSOI must maintain commercial general liability insurance in the amounts of not less than one million dollars ($1,000,000) per incident and one million dollars ($1,000,000) annual aggregate. After the commencement of the first clinical trial for said Cell Dose, but prior to the first commercial sale of said Cell Dose, TSOI must maintain commercial general liability insurance in the amount of not less than one million dollars ($1,000,000) per incident, and clinical trials liability insurance in the amount of not less than three million dollars ($3,000,000). Immediately prior to the commencement of the first clinical trial for said Cell Dose, UNIVERSITY, its employees and agents, will be named as additional insured.

    (b)  TSOI shall not cancel such insurance without thirty (30) days prior notice to UNIVERSITY. Such cancellation shall be cause for termination.

9.2. <u>USE OF NAME</u>. TSOI shall not, without the prior written consent and approval of an authorized representative of UNIVERSITY, use any name, trade name, trademark, or other designation of UNIVERSITY, or any of its trustees, faculty, students, employees, or departments, or any adaptation thereof (including contraction, abbreviation, or simulation) in any publication, including advertising, promotional or sales literature, or any other activities or context.

9.3. <u>GOVERNING LAW, VENUE, AND DISPUTE RESOLUTION</u>.

    (a)  This Agreement shall be considered as having been entered into in the State of Florida, United States of America, and shall be construed and interpreted in accordance with the laws of the State of Florida. In any action or proceeding arising out of or relating to this Agreement (an "Action"), each of the Parties hereby irrevocably submits to the jurisdiction of any federal or state court sitting in Miami-Dade County, Florida, and further agrees that any Action shall be heard and determined in such Florida federal court or in such state court. Each Party hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of any Action in Miami-Dade County, Florida.

    (b)  If a dispute arises between the Parties relating to the interpretation or performance of this Agreement or the grounds for the termination thereof, the Parties agree to hold a meeting, attended by individuals with decision-making authority regarding the dispute, to attempt in good faith to negotiate a resolution of the dispute prior to pursuing other available remedies. If the dispute remains unresolved forty-five (45) days after the first meeting for the purpose of dispute resolution, then each Party shall have the right to pursue other remedies legally available to resolve the dispute.

DocuSign Envelope ID: 584B5676-3413-4286-94ED-67E5D0D258E1

9.4.  CAPTIONS. The captions and section headings of this Agreement are solely for the convenience of reference and shall not affect its interpretation. Unless otherwise specified, terms in the singular shall include terms in the plural, and vice-versa. The term "or" is used in the inclusive sense and means "and/or" unless otherwise specified.

9.5.  SEVERABILITY. Should any part or provision of this Agreement be held unenforceable or in conflict with the applicable laws or regulations of any jurisdiction, the invalid or unenforceable part or provision shall be replaced with a provision that accomplishes, to the extent possible, the original business purpose of such part or provision in valid and enforceable manner, and the remainder of this Agreement shall remain binding upon the Parties.

9.6.  COUNTERPARTS. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

9.7.  SURVIVAL.

(a)  The provisions of Sections relating to Definitions, Representations, Indemnification, and Limitation of Liability, Confidentiality, Notice, and Miscellaneous Provisions shall survive the termination or expiration of this Agreement, and shall remain in full force and effect.

(b)  The provisions of this Agreement that do not survive termination or expiration hereof (as the case may be) shall, nonetheless, be controlling on, and shall be used in construing and interpreting, the rights and obligations of the Parties with regard to any dispute, controversy, or claim that may arise under, out of, in connection with, or relating to this Agreement.

9.8.  AMENDMENT. No amendment or modification of the terms of this Agreement shall be binding on either Party unless reduced to writing and signed by an authorized officer of each Party.

9.9.  NON-WAIVER. No failure or delay on the part of a Party in exercising any right hereunder will operate as a waiver of, or impair, any such right. No waiver of any of the provisions of this Agreement shall be effective unless it is in writing, and signed by the Party against whom it is asserted, and any such written waiver shall only be applicable to the specific instance to which it relates and shall not be deemed to be a continuing or future waiver. No single or partial exercise of any such right will preclude any other or further exercise thereof or the exercise of any other right. No waiver of any such right will be deemed a waiver of any other right hereunder.

9.10.  INDEPENDENT CONTRACTOR RELATIONSHIP. This Agreement is not intended to create nor shall be construed to create any relationship between the Parties other than that of independent entities contracting for the purpose of effecting provisions of this Agreement. It is further expressly agreed that no work, act, commission, or omission of any Party, its agents, servants, or employees, pursuant to the terms and conditions of this Agreement, shall be construed to make or render any Party, its agents, servants, or employees, an agent, servant, representative, or employee of, or joint venturer with, the other Party. Neither Party shall have any right to bind or obligate the other Party in any way, nor shall it represent that it has any right to do so.

9.11.  REPRESENTATION BY COUNSEL. Each Party acknowledges that it has had the opportunity to be represented by counsel of such Party's choice with respect to this Agreement. In view of the foregoing and notwithstanding any otherwise applicable principles of construction or interpretation, this Agreement shall be deemed to have been drafted jointly by the Parties and in the event of any ambiguity, shall not be construed or interpreted against the drafting Party.

9.12.  NO THIRD-PARTY BENEFICIARIES. No third persons or entities are intended to be or are third-party beneficiaries of or under this Agreement. Nothing in this Agreement shall be construed to create any liability on the part of the Parties or their respective directors, officers, shareholders, employees, or agents, as the case may be, to any such third party for any act or failure to act of any Party.

DocuSign Envelope ID: 584B5676-3413-4286-94ED-67E5D0D258E1

9.13. <u>CONFLICTS</u>. TSOI understands and agrees that UNIVERSITY personnel who are engaged by TSOI, whether as consultants, employees, or otherwise, or who possess a material financial interest in TSOI, are subject to UNIVERSITY's rule regarding outside activities and financial interests set forth in the University of Miami Faculty Manual and Intellectual Property Policy. Any term or condition of an agreement between TSOI and such UNIVERSITY personnel that seeks to vary or override such personnel's obligations to UNIVERSITY may not be enforced against such personnel or UNIVERSITY without the express written consent of an individual authorized to vary or waive such obligations on behalf of UNIVERSITY. Furthermore, should an interest of TSOI conflict with the interest of UNIVERSITY, UNIVERSITY personnel are obligated to resolve such conflicts according to the guidelines and policies set forth by UNIVERSITY.

9.14. <u>ENTIRE AGREEMENT</u>. This Agreement constitutes the entire agreement between the Parties respecting the subject matter hereof, and supersedes and terminates all prior agreements respecting the subject matter hereof, whether written or oral, and may be amended only by an instrument in writing executed by both Parties. UNIVERSITY and its faculty, staff, students, and other end users shall not be bound by any "shrink-wrap" or "click-through" terms and conditions or other content on TSOI's website, regardless of when opened or clicked or by whom, even where such terms and conditions or other content state otherwise.

9.15. <u>FORCE MAJEURE</u>. Except for TSOI's payment obligations hereunder, neither Party shall be held responsible for any delay of failure in performance of any part of this Agreement to the extent such delay or failure is caused by fire, flood, explosion, war, embargo, government requirement, civil or military authority, act of god, or other similar causes beyond its control and without the fault or negligence of the delayed or non-performing Party. The affected Party will notify the other Party in writing within ten (10) days after the beginning of any such cause that would affect its performance. Notwithstanding, if a Party's performance is delayed for a period exceeding thirty (30) days from the date the other Party receives notice under this section, the non-affected Party will have the right, without any liability to the other Party, to terminate this Agreement.

9.16. <u>TAX-EXEMPT STATUS</u>. TSOI acknowledges that UNIVERSITY, as a not-for-profit institution of the State of Florida, holds the status of an exempt organization under the Internal Revenue Code of 1986, as amended. TSOI also acknowledges that certain facilities in which the Regulatory Assets or Cell Doses were developed may have been financed through offerings of tax-exempt bonds. If the Internal Revenue Service determines, or if UNIVERSITY reasonably determines, that any term of this Agreement jeopardizes the tax-exempt status of UNIVERSITY or the bonds used to finance UNIVERSITY facilities, the relevant term is invalid and the Parties shall modify the term accordingly.

9.17. <u>NO OUTSTANDING OR KNOWN FUTURE CLAIMS/CAUSES OF ACTION</u>. Each Party affirms that it has not filed with any governmental agency or court any type of action or report against the other Party, and currently knows of no existing act or omission that may constitute a claim or liability against the other Party.

*[Signature Page Follows]*

DocuSign Envelope ID: 584B5676-3413-4286-94ED-67E5D0D258E1

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized and to be made effective as of the Effective Date.

**TSOI**

| | |
|---|---|
| *Timothy G. Dixon* | 3/25/2022 |
| Signature | Date |

Timothy G. Dixon

Printed Name

Chief Executive Officer

Printed Title

**UNIVERSITY**

| | |
|---|---|
| *Brandon Gilliland* | 3/24/2022 |
| Signature | Date |

Brandon E Gilliland

Printed Name

Vice President & CFO

Printed Title

While not a party to this Agreement, Jadi Cell, LLC hereby acknowledges and authorizes the transfer of the Cell Doses from UNIVERSITY to TSOI by way of this Agreement:

| | |
|---|---|
| *Amit Patel* | 3/25/2022 |
| Signature | |

Amit Patel

Printed Name

Chief Executive Officer, Jadi Cell, LLC

Printed Title